UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| LARRY ADAMS, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 3:13-CV-47 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner Larry Adams (TDCJ # 1683856) seeks habeas corpus relief under 28 U.S.C. § 2254.  Adams challenges his three convictions for aggravated robbery because (1) there was insufficient evidence; (2) the State engaged in prosecutorial misconduct by (a) failing to disclose a video tape, and (b) engaging in improper jury argument; and (3) trial counsel was ineffective because counsel failed to (a) move for a competency hearing, and (b) cross examine a key witness. Respondent has filed a motion for summary judgment.  After considering the pleadings, the record, and the applicable law, the Court **GRANTS** Respondent's Motion for Summary Judgment for the reasons discussed below.

## I.    PROCEDURAL BACKGROUND

On November 15, 2010, a Galveston County jury found Adams guilty of three counts of aggravated robbery and sentenced him to a term of nine years for one count, and two terms of six years imprisonment, to run concurrently. On direct appeal, Adams challenged his conviction due to lack of sufficient evidence.  On June 14, 2012, the First Court of Appeals of Texas affirmed the conviction.  Adams did not file a petition for discretionary review.

Adams filed three state applications for writ of habeas corpus challenging his convictions. On January 30, 2013, the Court of Criminal Appeals denied the applications without written order. Adams filed this federal petition on February 21, 2013.

II.    FACTUAL BACKGROUND

The following statement of facts is from the First Court of Appeals' opinion affirming

Adams's conviction:

On December 19, 2009, Kelly Collins was working as an attendant at the Keno Castle game room in Bacliff.  The game room was open only to members, in part, because it was illegally awarding cash prizes.  Both the front and back doors to the game room were secured such that anyone seeking entry would have to knock or press a buzzer.  Collins could then check a camera, and if she knew the person, allow him to enter.  Around 11:30 a.m., a man knocked on the front door.  Collins did not recognize him, so she did not let him in.

At about 2:30 p.m., four people were playing in the game room: Terry Robinson, Raul Gutierrez, Sidney Brummerhop, and Linda Carman.  The back doorbell rang.  Collins checked the camera and saw Adams, who was a member of the game room and an acquaintance of Robinson.  Collins opened the door for Adams, he entered, and the two exchanged greetings.

The door was slowly closing behind Adams, but, before it shut completely, a man brandishing a semiautomatic pistol grabbed the door and burst inside.  Collins testified that this was the same man she had denied entry to earlier that day.  He was later identified as Michael McFarland.  Collins grabbed McFarland's arm and forced it upwards to keep the pistol pointed away from herself and the patrons.  A second man, later identified as Jovan Wesby, came in, also with a semiautomatic pistol.  Wesby struck Collins in the head two or three times with the pistol.  She fell to the ground, but continued to struggle.  Wesby was reaching under Collins's shirt, as though he knew she sometimes kept money in her brassiere.  Collins said that, while Wesby assaulted her, Adams jumped back and forth into the other room a few times and then just stood there.  When McFarland went into the main game room, Wesby hauled Collins to her feet and forced her to unlock the office and open the safe, pushing her to the floor after she had done so.  After emptying the safe and the register, Wesby ransacked the office, finding an additional stash of cash hidden under the bag in the trash can.  All told, he took between $5300 and $5500 from the office.

Meanwhile, McFarland robbed Guiterrez and Brummerhop at gunpoint.  McFarland, yelling, ordered the patrons to not look at him and to get on the ground.  All of the patrons followed McFarland's commands except for Adams who got on his knees at one point, but then stood back up.  The surveillance video introduced at trial shows Adams, in response to a gesture from McFarland, checking the drawers of Collins's desk, pulling her purse out of a drawer, and placing it on the desktop.  McFarland took the purse on his way out.  The surveillance video shows that, during the robbery, Adams and Robinson were located on one end of the game room, while Guiterrez, Brummerhop, and Carman were towards the opposite end.  When he entered the game room, McFarland rushed straight towards those three, passing but ignoring Robinson and Adams.  On his way out, McFarland passed Robinson and Adams, but made no apparent attempt to rob them.  Adams later said, in fact, he was robbed by

McFarland, but claimed that it took place in an area of the game room that was not recorded by the surveillance camera.

When McFarland and Wesby left, Collins called 911 from her cell phone.  She went out the front door to try to improve reception, bringing the others with her.  Deputy Bryant with the Galveston County Sheriff's Office happened to be nearby and arrived shortly after Collins reported the robbery.  As he was taking initial statements from Collins and the patrons, Adams told him that the robbers took $270 of Adams's money as well as his car keys.  Adams also told Bryant that his car had been stolen.  Bryant reported this information over his radio, including a description of the car.

While Bryant was taking statements, he could hear the police radio broadcast about the search for the robbers.  At one point, Bryant heard that a car matching the description of Adams's car had been found two blocks from the game room.  When officers ran the plates, they confirmed the car was registered to Adams.  Adams asked if he could leave to get his car, but Bryant asked him to stay.

Deputy Bryant became suspicious of Adams for a variety of reasons.  He noticed that Adams behaved differently from the other victims and witnesses.  Where they were reserved and still "in shock," Adams was very talkative.  Adams also repeatedly asked if he could leave the scene, even before the information about his car came in over the radio.   And Adams told Bryant that his keys had been stolen, but nevertheless was continually "fumbling with" some keys at the scene.  Bryant also found suspicious the fact that the robbers had entered closely behind Adams, but were not visible to Collins when she opened the door for Adams.

A few minutes before the robbery, Thomas Larry Adams (no relation to the appellant and whom we will refer to as Thomas for clarity) was returning to his home two blocks from the game room after being out of town for a short period.  He noticed that two cars were parked directly in front of his house.  One was a small blue compact, and the other was a black medium size sedan.  He observed two men walking from the blue car to the black one, where a third man sat in the driver's seat. They got inside the passenger side of the black car and drove off.  Thomas did not get a good look at the driver of the black car.

Because there had been several crimes in his neighborhood, Thomas called Investigator Todd Collins with the Sheriff's Office.  He gave Collins the license plate number of the blue car that remained in front of his house and asked Collins if there had been any break-ins or other problems while Thomas was away.  While he was waiting to hear back from Collins, the black car came "tearing back down" the street and slammed on the brakes.  The two men he previously saw getting into the black car got out, jumped in the blue car, and drove off.
Deputy Galindo was responding to the robbery call when he heard police broadcast over the radio a description of the blue car, specifying its license number and the fact that that it was occupied by two black males.  When a car matching that description passed him heading in the opposite direction, Galindo activated his lights and siren, made a u-turn, and followed the car.  The suspects led him on a high-speed chase, during which the passenger threw a bag of money and a gun out the window.  After striking two other vehicles, the driver of the blue car lost control and crashed into a

roadside ditch. Galindo and other law enforcement personnel arrested the two men. They were McFarland and Wesby.

Investigator Echols, the lead investigator, had McFarland and Wesby taken back to the game room. He spoke with the victims and with Deputy Bryant and reviewed the surveillance video. The video of the parking lot behind the game room showed a black car drive by slowly just before the robbery took place. A few minutes later, the black car pulled into the lot and parked. The video showed Adams get out of the driver's seat and two other men get out of the passenger side, and then showed Adams approach the back door. Echols decided to detain Adams and Robinson.

At trial, Adams denied any involvement in the robbery. He testified that he came to the game room looking for Robinson, who had called him earlier that day. As he approached the back parking lot, he said he saw two men whom he did not recognize. The two men were McFarland and Wesby. McFarland flagged him down and called Adams by his nickname, "Wookie." McFarland complimented Adams's car—a black Impala SS that Adams had just brought to the Houston area from New Orleans. By the way McFarland spoke of the car, Adams knew that McFarland must have known him from New Orleans. McFarland asked for a ride and Adams obliged. He took them about a block and then McFarland told Adams that the man he and Wesby were supposed to meet was not there and asked if Adams would drive them back to their car. Adams testified that when he parked at the game room, he assumed the two men were then going to get their own car. He did not know where they went after that.

Adams testified that he tried to help Collins as she struggled with Wesby. He also said that McFarland struck him on the head with a pistol. He told the jury that, although McFarland held him at gunpoint and ordered him to get down on the floor, he stood up because he was afraid of being shot in the back of the head. He said that McFarland ordered him to search the desk and he did so because McFarland had a gun. Adams also explained that he had two sets of keys. Because he had just parked his car, his car keys were in his hand. Those were the keys McFarland took, and the keys Deputy Bryant saw him holding were all his other keys. Finally, Adams denied that he had picked up McFarland and Wesby in front of Thomas's house.

On cross-examination the State identified discrepancies between Adams's statement to investigators and his testimony before the jury. Adams explained that he had suffered a head injury in a motorcycle accident and was taking medication for it. He said it affected his memory, but since he had been sitting in jail for eleven months for a crime he did not commit, he had had time to think and remember more details that he did not give in his statement to investigators.

*Adams v. State*, 2012 WL 2159247 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

## III.   STANDARD OF REVIEW

The Court reviews Adams's petition under the federal habeas statutes as amended by the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. When a state

court has adjudicated a claim on the merits, federal habeas relief cannot be granted unless the state court decision (1) was contrary to clearly established federal law as determined by the United States Supreme Court; (2) involved an unreasonable application of clearly established federal law; or (3) was based on an unreasonable factual determination in light of the evidence presented. *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

A state court unreasonably applies Supreme Court precedent if it improperly employs the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal court must presume the underlying factual determination of the state court to be correct unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330-31.

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(c).  Summary judgment rules apply in a section 2254 proceeding only to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the non-movant.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), overruled on other grounds by *Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV.   DISCUSSION

### A.  Insufficient Evidence

Adams first claims that he should be granted relief because his conviction is not supported by sufficient evidence.  Docket Entry No. 1 at 6.  Adams raised this claim on direct appeal but he did not file a petition for discretionary review; thus, the claim was not considered by the Texas Court of Criminal Appeals.  Adams raised this claim again in his state writ; however, sufficiency of the evidence claims are not cognizable in a post-conviction writ of habeas corpus in Texas.  *Ex parte Williams*, 703 S.W. 2d 674, 677 (Tex.Crim.App. 1986).  The Fifth Circuit has recognized that state procedural bar.  *West v. Johnson*, 92 F.3d 1385, 1398, n. 18 (5th Cir. 1996) (sufficiency of the evidence may be raised on direct appeal, but not in a habeas corpus proceeding).  Because this claim was never properly before the Texas Court of Criminal Appeals, it is procedurally barred from federal habeas review unless cause and prejudice or a miscarriage of justice is demonstrated.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).   Adams has not shown cause and prejudice or a miscarriage of justice; therefore, this claim is procedurally barred from federal review.

### B.  Prosecutorial Misconduct

Adams also alleges prosecutorial misconduct when the State made improper arguments. Docket Entry No. 1 at 6.  He further asserts that the State suppressed evidence in violation of his due process rights.  *Id.*

1.   Improper Jury Argument – Failure to Exhaust State Remedies

Adams claims that the State introduced new evidence during closing arguments that was not presented at trial. Under the AEDPA, a prisoner must exhaust all state remedies by presenting them to a state's highest court before filing a federal writ of habeas corpus.  28 U.S.C. § 2254(b)(1)(A).; *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).  In Texas, this means a prisoner must present his claims to the Texas Court of Criminal Appeals in either a petition for discretionary review or an application for writ of habeas corpus.  *See Bautista v. McCotter*, 793 F.2d 109, 110 (5th Cir. 1986); *Whitehead*, 157 F.3d at 387. As Respondent correctly points out, Adams failed to bring this claim on direct appeal or in his state habeas corpus application.  The claim is therefore unexhausted and federal relief is not available.

2.     *Brady* Violation

Adams next asserts that the State suppressed a video that was material to his case. Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963),  "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  To establish a *Brady* violation, a petitioner must show that (1) there was suppression of evidence by the prosecution after a request by the defense; (2) the evidence was favorable to the defense; and (3) the evidence was material to the defense.  *Moore v. Illinois*, 408 U.S. 786, 795 (1972).  Evidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Id.*

The surveillance video that Adams believes was "*possibly* material evidence favorable to his defense," was one showing only the other two robbers attempting to obtain entry to the game room hours before the robbery occurred. Docket Entry No. 7-20 at 38 (emphasis added).  Adams opines that since he was charged under the law of parties, it was material that the jury see that he was not

involved in the robbery from the very onset.  Docket Entry No. 12 at 7.  Adams's plea is unavailing, however, because the same facts regarding Adams's absence from this video were, in fact, available at the time of trial.[1]  In rejecting this claim, the state habeas court made an implicit credibility choice against any assertion that the State withheld evidence, and this finding is entitled to the statutory presumption of correctness.  28 U.S.C. § 2254(e).  As correctly stated by the Respondent, Adams failed to argue or show that . . . the state court's decision to deny relief was an unreasonable application of clearly established federal law or an unreasonable application of the facts in light of the evidence presented."  Docket Entry No. 11 at 18.   This claim is denied.

### C.    Ineffective Assistance of Trial Counsel

Adams seeks relief for ineffective assistance of trial counsel because counsel (1) failed to move for a competency hearing; and (2) failed to cross-examine key witnesses.  Docket Entry No. 1 at 7.   An ineffective assistance of counsel claim previously rejected by a state court is evaluated under a "doubly deferential" standard.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  The first level of deference requires that a petitioner demonstrate that (1) his attorney's representation was so deficient that the attorney was not functioning as the counsel that the Sixth Amendment guarantees and (2) the defense was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The first prong of this test is measured under "an objective standard of reasonableness."  *Id.* at 688.  A court's review of the trial attorney's performance must be "highly deferential."  *Id.* at 689.  "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.*  (*quoting Michel v. Louisiana*, 350 U.S. 91,

---

[1] The record reflects that Ms. Collins stated that she saw the other two robbers and the vehicle they were driving a few hours prior to the actual robbery, but did not see Adams.  Docket Entry No. 7-11 at 51:21-25; 52:1-25; 53:1-11.

101 (1955)).  Under the second prong, the defendant has the burden to affirmatively prove prejudice --- that there is a "reasonable probability" that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  *Id.* at 693.

The second level of deference is that afforded under the AEDPA, requiring this Court to afford deference to the state court's determination of Adams's ineffective assistance claim unless it was contrary to, or an unreasonable application of, the Strickland standard. See 28 U.S.C. §2254(d)(1).

### 1.    Failure to Move for Competency Hearing

Adams claims that this counsel knew that he suffered from mental retardation, yet failed to move for a competency hearing.  A defendant is competent if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him."  *Dusky v. U.S.*, 362 U.S. 402, 402 (1960).  In determining whether a competency hearing is required, a trial court should give partial consideration to "(1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions."  *See Enriquez v. Procunier*, 752 F.2d 111, 113 (5th Cir. 1984).  A trial court is obligated to conduct a competency hearing only if the evidence suggests that a defendant's competency is in doubt.  *See Pate v. Robinson*, 383 U.S. 375, 385 (1966).

Adams's claim that his counsel was ineffective for failing to move for a competency hearing is not supported by the facts and is conclusory.  While Adams contends that he suffers from mental retardation, he has presented no evidence to show that his mental state rendered him incompetent. There is no indication that Adams has a history of irrational behavior; nor are there any prior medical

opinions supporting such findings.[2]   Moreover, the record clearly reveals that trial counsel presented facts concerning Adams's mental state at trial.  Docket Entry No. 7-13 at 45: 5-19; 46: 3-5; 73:11-18. There is simply no evidence casting doubt on the defendant's competency to stand trial.

Additionally, the state habeas court addressed and rejected this claim on the merits and those findings are entitled to a presumption of correctness, which applies to both explicit and implicit findings necessary to support findings of mixed law and fact.   28 U.S.C. § 2254(e); *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th Cir. 2001).  This claim is denied.

## 2.  Failure to Cross-Examine Key Witness

Adams next complains that trial counsel was ineffective for failing to cross-examine three witnesses for the prosecution — Thomas Larry Adams, Sidney Brummershop, and Linda Carman. Adams fails, however, to show how counsel's failure to examine these three witnesses was deficient or prejudicial to the outcome of his case.

Claims regarding a trial attorney's failure to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trail strategy and "speculation about what witnesses would have said on the stand is too uncertain."  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).  A petitioner challenging his counsel's failure to call a witness must demonstrate prejudice by not only naming the witness, but also by demonstrating that the witness was available to testify.  A petitioner must also set out the content of the witnesses proposed testimony and show that the testimony would have been favorable to his defense.  *Id.* at 808.

Other than naming the witnesses, Adams accomplished none of the requirements necessary to demonstrate prejudice...he simply states that prejudice is presumed.  "A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of the *Strickland* test."  *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).  Without more, Adams cannot affirmatively show or prove that but for counsel's

---

[2] Rather, after the trial court thoroughly questioned him and informed him of his rights, Adams stated that he understood and was still willing to testify on his behalf.

deficient performance in this regard, the result of his trial would have been different.  Although the record shows that trial counsel did, in fact, choose not to cross-examine certain witnesses, Adams has not overcome the presumption that, under the circumstances, counsel's decision might be considered sound trial strategy.  *See Strickland*, 466 U.S. at 690.  The state habeas court's rejection of this claim did not involve an unreasonable application of established federal law or one that was contrary to established federal law.  This claim is denied.

### V.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253, a petitioner must obtain a certificate of appealability before he can appeal the district court's decision to dismiss his petition.  This Court will grant a certificate of appealability only if the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).   In order to make a substantial showing, a petitioner must demonstrate that issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further. *Lucas v. Johnson*, 132 F.3d 1069, 1073 (5th Cir. 1998).  For the reasons stated in this Memorandum and Order, Adams has not made a substantial showing of the denial of a constitutional right.  *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir. 1996).  The Court will deny the issuance of a Certificate of Appealability.

### VI.   CONCLUSION

For the foregoing reasons, Respondent's Motion for Summary Judgment is **GRANTED** and this case is **DISMISSED** with prejudice.

It is so **ORDERED**.

SIGNED on this 1st day of July, 2014.

 

_____
Kenneth M. Hoyt
United States District Judge